206

Mildred McCORD, Plaintiff,

v.

Anthony J. CELEBREZZE, Secretary of
Health, Education and Welfare,
Defendant.

Civ. A. No. 4009.

United States District Court
W. D. South Carolina,
Greenwood Division.

Sept. 13, 1963.

J. Hewlette Wasson, Laurens, S. C.,
W. H. Nicholson, Jr., Greenwood, S. C.,
for plaintiff.

John C. Williams, U. S. Atty., Robert
O. DuPre, Asst. U. S. Atty., Greenville,
S. C., for defendant.

WYCHE, District Judge.

This is an action under section 205(g)
of the Social Security Act, as amended,
42 U.S.C.A. § 405(g), to review a final
decision of the Secretary of Health, Edu-
cation and Welfare, giving this Court the
power to enter upon the pleadings and
transcript of the record, a judgment af-
firming, modifying or reversing the de-
cision of the Secretary, with or without
remanding the cause for rehearing.

The final decision of the Secretary in
this case consists of a decision rendered
on December 11, 1961, by the Appeals
Council, which decision became the final

decision of the Secretary. Said final decision holds that the plaintiff is not entitled to the establishment of a period of disability or to disability insurance benefits under Sections 216(i) and 223 of the Act, 42 U.S.C.A. §§ 416(i), 423, based on her application filed on January 20, 1960.

Plaintiff met the earnings requirements for disability purposes in the alleged quarter of onset of disability, the first quarter of 1960, and met them at the time of filing her disability application. To be entitled to disability insurance benefits and the establishment of a period of disability, the plaintiff had to establish that since February 1, 1960, or beginning at a time when she met the special earnings requirements for disability purposes, and continuing to the date of the filing of her disability application on January 20, 1960, she had a medically determinable physical or mental impairment, or combination of impairments, of such severity that she was unable to do any type of substantial gainful work.

Plaintiff was born September 8, 1906. She received an AB degree from Lander College and after some months of study at the Spartanburg General Hospital qualified as a laboratory technician. She worked in the office of Dr. A. E. Adams of Greenwood, South Carolina, for approximately ten years as a laboratory technician. She worked for Dr. Adams until November, 1959, when he closed his laboratory. She rested for a month and then took a job as laboratory technician at Self Memorial Hospital in Greenwood, beginning January 4, 1960. She was not able to do this work even after a lightening of her work-load and her employment was terminated. Because of plaintiff's determination and desire to work she worked for two years or more against the advice of her physicians. She is now unable to do any work, not even housework. She spends her time resting, reading and looking at television. She lives with her widowed mother in her mother's home. While she worked she supported her mother. She has no income since quitting work.

Plaintiff suffers with severe headaches, dizziness, shortness of breath, chest pain, a tightness in her chest under stress and strain or excitement, radiating toward the breast bone and through to her spine, spreading out under her shoulders, which generally takes several days of medication to relieve when it is severe, marked urine retention, nausea and on occasion high temperature. Plaintiff has a strong familial tendency toward cardiovascular disease. Relatives from both the mother's and father's side of the family have suffered from this disease and died in their fifties or sixties.

Dr. A. E. Adams, for whom plaintiff worked for ten years, in his report stated that since 1954, plaintiff's condition has gradually grown worse, that she has symptoms of weakness, right-sided pain at intervals, nausea, headache, nervousness, inability to void for ten to twelve hours, occasional pedal edema, insomnia, precordial constriction with pain radiating into the back and shoulders, dyspnea upon exertion, dizziness, faintness, ease of fatigue and marked tremor of hands, nephroptosis, right; there has been a gradual elevation in her blood pressure despite antihypertensive therapy and good patient conduct and cooperation, and gave as his opinion that plaintiff is totally and permanently disabled to carry on any substantial gainful employment.

Dr. M. B. Nickles of Laurens, South Carolina, plaintiff's family physician, stated that he had had plaintiff's case under observation since 1936–37, and that he and his partner, Dr. Dusenberry, had examined her on a number of occasions and had noted the gradual deterioration of her cardiovascular condition. He stated that he advised her to quit work in 1957, and 1958, but "She has determination, * * * and in view of the fact that she has not responded to treatment, either by myself or Dr. Adams, I referred her to Dr. George Wilkinson for evaluation, * * *."

Dr. Nickles' report of date July 17, 1961, states: "The patient, as previously reported, has been under my care as well as the care of other physicians for

several years. She is suffering from hypertensive vascular disease with evidence of myocardial degeneration. Her chest pain is more severe with a less amount of exertion than she has been having in the past and she is also developing an edema of both lower legs which has had to be treated by diuretics. Her condition is progressive and she has to spend a great deal of time in bed. It has been necessary to increase her rest periods, from time to time, over a period of from twelve to fifteen months and in spite of this increase she has continued to become progressively worse. In view of this it is my opinion that there is no hope of improvement in her hypertensive vascular condition since there has been a rather rapid rate of progressiveness on the part of the disease. This conclusion is evident from the electrocardiograph changes made on May 17, 1961 and June 23, 1961 as compared to tracing done in October, 1960. Her blood pressure continues to run from 170/110 to 220/130.

"It is my opinion that the patient has not been able to work, successfully and gainfully, since the first part of 1959; however, due to her determination to continue working and her refusal to quit, she was able, through unusual effort, to continue her employment with Dr. Adams who gave her special consideration since she had worked with him over a period of years."

Dr. Dusenberry, Dr. Nickles' partner, concurred in Dr. Nickles' opinion as to plaintiff's disability to work.

Dr. George R. Wilkinson, Jr., after examination, made the following statement: "These electrocardiographic changes in the seven months interim between compared tracings are indicative of myocardial degeneration and resulting from hypertensive cardiovascular disease. These changes would, therefore, strongly point to her advancing disease and are objective indications of her impaired cardiac reserve. This impaired cardiac reserve is further indicated subjectively by the patient's increasing dyspnea on slight exertion and chest pain on exertion, following meals, and with an excite-

ment" and that in his opinion, plaintiff is disabled to work.

Dr. Hunter May, the pathologist at Self Memorial Hospital, for whom the plaintiff last worked, referred to her symptoms which caused termination of her employment and gave an opinion that "she is physically unable to perform satisfactorily the type of work that her background and training suits her for, namely, laboratory technology."

Dr. J. Roland McKinney, an internist in Greenwood, South Carolina, and Dr. Peter Gazes of Charleston, South Carolina, examined the plaintiff at Government expense. Dr. McKinney made one examination of date June 22, 1960, and his conclusions were: "1. Hypertension, etiology undetermined but probably essential, moderate. 2. Probable hypertensive cardiovascular disease, compensated, Functional Class II. 3. No evidence of renal decompensation."

Dr. Gazes made one examination of plaintiff on August 22, 1961, and his conclusions are as follows: "Hypertensive cardiovascular disease. Compensated. In view of history, probable angina. Classification: Class II, Therapeutic C. In view of low kidney function performance, probably has early renal changes on a nephrosclerotic basis. Vaso-vagal syncope."

Neither Dr. McKinney nor Dr. Gazes made a definite finding of plaintiff's ability to work. They were requested by the Government "to refrain from expressing any opinion in the record or otherwise as to the employability or percentage of disability" of plaintiff.

The examination made by Dr. McKinney was made about five months after plaintiff retired from work and had been under almost complete rest, and at the time she was examined by Dr. Gazes she had been under treatment and rest conditions for about eighteen months. Both examinations were made under the most favorable conditions.

As to the failure of mechanical devices such as electrocardiograms and x-rays to show the presence of cardiovascular dis-

ease in the plaintiff, Dr. M. B. Nickles, in a letter dated October 2, 1961, says, " * * * I wish to state from Friedberg *Diseases of the Heart* that 'electrocardiographic abnormalities may be absent in one quarter to one half of the cases of coronary heart disease, especially in those characterized only by angina pectoris', * * *. It should also be noted that this patient has a strong familial tendency toward cardiovascular disease. I have had occasion to follow some of the ten relatives who died as a result and she is following a very similar pattern of disease as did some of the deceased relatives." And Dr. Nickles testified at the hearing in answer to questions by the Examiner, as follows: "Q. You say that in spite of the fact that x-rays and electrocardiograms do not indicate any cardiac enlargement, the fact remains that she has hypertensive disease. Do I understand that the x-rays and electrocardiograms you took of her were negative? A. No. I think if you will note in the report that mention is made that we did find an occasional myocardial ischemia which was not permanent. It is something you pick up today and don't get tomorrow. And I can concur in the other reports that her heart is not enlarged. Q. Is that of any significance in a case of cardiovascular disease? A. Definitely so. That is where a physician has to rely on his own ingenuity. You don't find anything, yet the patient has the symptoms, and also evidence to back up the symptoms, which is manifested by continued hypertension. When she exerts herself and develops chest pain and the shortness of breath and headache, and the pain radiates into her arm, she has insufficient blood supply in the heart muscle, which will not be picked up by anything except an occasional deviation from the normal, and we have found that. It is not going to give you a permanent deviation from normal like a thrombosis would. Q. As I understand your testimony, some of her impairments cannot be determined by some of the technical diagnostic aids? A. That is absolutely correct. Q. And that perhaps a physician

who has not been well acquainted with the patient will not be able to tell by the ordinary diagnostic aid, such as an electrocardiogram, actually what the impairments are? Is that your testimony? A. Yes. Q. Did you give claimant a so-called Master's two-step test? A. No. Q. I notice that in your report, dated June 14, 1960, addressed to the South Carolina State Agency, you stated that the amount of exercise required to produce dyspnea was ten hops. What did you mean by that? A. Just to jump up and down. Q. What would that indicate, in your opinion? Would that be normal? A. No, it is definitely not normal. It indicates cardiac trouble. And there again the patient would be your guide, rather than some technical device. And there again too, the physician who has seen her over a period of time and repeatedly, is in better position for evaluation than a man who casually sees her one time."

The reports of all the examining physicians, including the two who examined the plaintiff at the request of the Government, show that the plaintiff is suffering from hypertensive cardiovascular disease, nephroptosis and nephrosclerosis, medically determinable physical impairments which can be expected to result in death or to be of long or indefinite duration. The reports of three of the doctors show that in spite of extensive treatment and rest, plaintiff has grown steadily worse. The only logical and reasonable expectation, based upon the medical evidence in the record, as well as the nature of the disease, is that it will continue to become worse with advancing age and ultimately result in death.

██ Authority for this Court to review a final decision of the Secretary is contained in Section 205(g) of the Social Security Act (42 U.S.C.A. § 405(g)), wherein Congress, in granting such jurisdiction to this Court, expressly imposed the limitation that the findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive. This Court may not substitute its own judgment for that of the Secretary

and may not reverse the decision below on the ground that, based on its own reappraisal of the evidence, it would have reached a different result. Kraynak v. Flemming (3d Cir., 1959), 283 F.2d 302; Meola v. Ribicoff (S.D.N.Y.1962), 207 F.Supp. 658. The substantial evidence doctrine limits the scope of this Court's review to the issue of whether, viewing the record as a whole, there is substantial evidence to support a reasoned determination of the Hearing Examiner after all the evidence supporting, as well as opposing, his conclusion has been taken into account. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456; Meola v. Ribicoff, supra. In such examination, however, the Court "must not abdicate the conventional judicial function." Brown v. Celebrezze (E.D.S.C.1962), 210 F.Supp. 692, 694.

The statutory definition of disability imposes a three-fold requirement: (1) There must be a "medically determinable physical or mental impairment which can be expected to result in death or to be of long-continued and indefinite duration"; (2) There must be "inability to engage in any substantial gainful activity"; and (3) The inability must exist "by reason of" the impairment. Pollak v. Ribicoff (2d Cir., 1962), 300 F.2d 674, 677; Meola v. Ribicoff, supra, 207 F.Supp. at 663. Plaintiff's hypertensive cardiovascular disease, and other impairments, are definitely medically determinable and can be expected to result in death or to be of long or indefinite duration. As to the second and third requirements, the Hearing Examiner found, "The work of a laboratory technician does not appear to be of such a physically arduous nature that it could not be performed by claimant in the physical condition shown by the record herein. * * * The examiner, therefore, finds that the evidence in this case does not establish that, after giving due consideration to claimant's age, education, work experience, and other relevant factors, her impairments, either singly or in combination, constitute a 'disability,' within the meaning and intent of the disability provisions of the Social Security Act, as amended." And the Appeals Council found, "In summation, therefore, and after a careful review of the entire evidence of record, the Appeals Council finds that the claimant's impairments, singly or combined, existing as of the date her application was filed, were not of such severity as to preclude her engaging in any substantial gainful activity. As stated by the Hearing Examiner in his decision, the claimant's work as a laboratory technician was certainly not of a physically arduous nature, and from the record presented herein there is no showing of an inability to perform such work."

The plaintiff presented evidence that she was disabled and unable to do the work for which she had been trained and further that her employer considered her disabled "to perform satisfactorily the type of work that her background and training suits her for, namely, laboratory technology", thus the plaintiff met her burden in this respect. See, Mims v. Celebrezze (D.C.D.Colorado), 217 F. Supp. 581 (1963). The record shows that plaintiff cannot even perform minor daily chores, such as washing dishes or any other housework.

Apparently the Hearing Examiner and the Appeals Council gave little consideration to the evidence that points to plaintiff's complete inability to do any sustained activity. The evidence shows that plaintiff is suffering from hypertensive cardiovascular disease, nephroptosis (fallen kidney) and nephrosclerosis (hardening of the kidneys) which is evidence and results of the cardiovascular disease manifested by the impaired kidney functioning, all of which seriously impair her ability to hold down any position requiring continuous attention or activity. In Dr. Gazes' report he says the plaintiff has "vasovagal syncope" which is defined in a medical dictionary as follows: "loss of consciousness resulting from an instability of the autonomic nervous system, which controls the caliber of the blood vessels and the blood pressure". It was the opinion of five of

the examining physicians that plaintiff is permanently and totally disabled to work; two of these physicians were the last employers of the plaintiff; three of the doctors say that in spite of extensive treatment and increased periods of rest, the condition of the plaintiff has grown worse.

■ The expert opinions of physicians as to disability are not binding on the Examiner, but an expert opinion to that effect which is not seriously controverted by substantial evidence to the contrary supplies this court with a proper ground, inter alia, for reversal. Teeter v. Flemming, 270 F.2d 871, 77 A.L.R.2d 636 (7 Cir., 1959); Pope v. Celebrezze, 209 F. Supp. 392 (D.C., 1962).

The Hearing Examiner in his decision says "Although not a matter of record, there is a possibility that claimant may have been induced to quit her job by psychological and emotional factors, such as the history of vascular disease on both sides of her family, which may well have led her to be apprehensive of further vascular impairment if she continued to work. However, claimant is only 54 years old, and her mother is still living at the age of 77. This would indicate the probability, from this aspect of the case, that claimant has many years of useful work ahead of her without serious detriment to her health."

■ As was stated in Ollis v. Ribicoff (W.D.N.C.1962), 208 F.Supp. 644, at 648, plaintiff's "physical and mental capacity to resist or adapt" to her impairments is a "proper basis for evidentiary inferences on these matters." Underwood v. Ribicoff (4th Cir., 1962), 298 F.2d 850. Thus, the culminating effect of these ailments and her strong familial tendency toward cardiovascular disease, upon the plaintiff must be weighed solely on the basis of the effect upon this particular woman not upon what the effects might be on others. "[T]he act is concerned not with a standard man of ordinary and customary abilities, but with the particular person who may claim its benefits and the effect of the impairment

upon that person, with whatever abilities or inabilities he has." Brown v. Celebrezze (E.D.S.C.1962), 210 F.Supp. 692, 694, quoting from Klimaszewski v. Flemming, D.C., 176 F.Supp. 927.

My review of the entire record convinces me that the plaintiff's earning capacity and capabilities in engaging in any substantial gainful activity are negligible if not non-existent.

■ After a careful examination of the record in this case and the foregoing authorities, I am of the opinion that the final decision of the Secretary is not supported by substantial evidence and is clearly erroneous. On the contrary, the conclusion that plaintiff is unable to engage in any substantial gainful activity appears self-evident to me. Plaintiff in this case is the victim of medically determinable physical impairments of serious and substantial proportions which can only be expected to result in death or to be of long-continued and indefinite duration. As a direct result of her combined impairments plaintiff has been unable since January 20, 1960, to follow her life-long employment in laboratory technology after being compelled to terminate same despite her willingness and desire to continue working. Plaintiff's combined physical impairments, when considered in connection with her individual circumstances of age, work experience, education, training and skill, serve to eliminate effectively, any reasonable possibility of suitable employment or employment for which plaintiff is qualified; she is unable to perform any substantial service with reasonable regularity in some competitive employment or self-employment.

Under the foregoing authorities, I must conclude that the findings of the Secretary as to the establishment of a period of disability and disability insurance benefits are not supported by substantial evidence on the record considered as a whole and under the authority for appeal given by 42 U.S.C.A. § 405(g) the conclusion of the Secretary that the claimant was not entitled to the period of disability and the disability insurance

benefits was clearly erroneous, was incorrect, and must, therefore, be reversed.

It is, therefore, ordered, that the decision of the Secretary in this case be and the same is hereby reversed, with direction that judgment be entered for the plaintiff.